## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re Premier Glass Services, LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Case No. 24-05367 |
| | ) | |
| | ) | Judge Deborah L. Thorne |

## MEMORANDUM OPINION

The debtor, Premier Glass, L.L.C. (Premier Glass) seeks an order from this court confirming its Subchapter V plan of reorganization. Christopher Glass & Aluminum, Inc. (CGI), the largest creditor, objected to the plan and confirmation. As a result, to successfully confirm the plan, which is deemed nonconsensual, the court must find that the debtor has met its burden of proof to propose a "fair and equitable" plan. As discussed below, the debtor has not met its burden of proof to propose a plan that is fair and equitable, and confirmation is denied without prejudice to the filing of an amended plan.[1]

## I.  Background

There is no love lost between Premier Glass and CGI. The parties have been litigating for years. CGI has accused Premier Glass and its principal, Romeo de la Cruz, of stealing CGI's customers and book of business. Prior to the petition date, the parties arbitrated the dispute, resulting in an award in favor of CGI—and against both Premier Glass and de la Cruz—for, among other things, tortious interference with CGI's business. The arbitration award is now before the

---

[1] Premier Glass may, if it chooses, submit a new plan within 45 days, along with a redlined version comparing the new plan to the Amended Plan at ECF No. 88. Throughout this opinion, citations to "Tr. Ex. __" refer to debtor's trial exhibits, which were admitted into evidence by the Court at the contested confirmation hearing on October 7, 2024. Unless otherwise indicated, all docket references are to the docket in this bankruptcy case, Case No. 24-05367. References to the Bankruptcy Code, Title 11 of the United States Code, have been abbreviated.

Circuit Court of Cook County for confirmation of the judgment.  Premier Glass and de la Cruz have objected to confirmation and the Circuit Court has yet to rule.[2]

Shortly after the entry of the arbitration award, Premier Glass filed a Subchapter V chapter 11 petition in the Bankruptcy Court for the District of Delaware.  On the motion of CGI, the case was removed to this court.  The court takes the facts discussed in this opinion from witness testimony and admitted evidence, as well as the dockets in the bankruptcy and adversary cases (of which the court takes judicial notice).  *Inskeep v. Grosso (In re Fin. Partners)*, 116 B.R. 629, 635 (Bankr. N.D. Ill. 1989).

### A.  **The Plan**

Premier filed an Amended Plan on July 17, 2024.  The plan placed claims of all general unsecured creditors into Class 1 and placed CGI and Premier Glass's prepetition lawyers' claims into Class 2.  Within this class, CGI's claim is valued at $2,081,676.45; the prepetition lawyers' claim is valued at $325,925.28.  Premier Glass reserved the right to object to claims for 180 days after confirmation of the plan but has not objected at this time to CGI's claim.  Any funds to be paid on account of the claims of CGI and the prepetition lawyers are to be held in escrow by a third party until the claims are finally liquidated.  (Tr. Ex. 7, also available as First Am. Plan, ECF No. 88.)  CGI objects to the plan and specifically to three line items in the projected budget: (1) legal fees, (2) depreciation expenses, and (3) taxes.

### B.  **Testimony**

Matthew Brash, the Sub. V trustee, was the only witness to testify during the confirmation hearing.  He testified that he prepared the projections with assistance of his firm, and that the projections were based upon documents he was provided by the debtor's CPA.  Although de la

---

[2] This court abstained from hearing the claim for tortious interference and remanded the claim back to the Circuit Court.  Adversary Case No. 24-00096, ECF No. 25.

Cruz, the president of the debtor, was present throughout the hearing and listed as a potential witness, he did not testify.  CGI violated the court's pre-trial procedures and was barred from presenting its own witnesses, but it did cross-examine Premier Glass's witness. (Order Sust. Obj. to List of Witnesses, ECF No. 137.)

Mr. Brash's projections were based on historical data that was not furnished to the court and for which he had little knowledge.  He was unable to explain much about calculations used to form the projections and often testified that he plugged in numbers to find a middle ground between "too conservative" and "pie in the sky."  He was unable to answer any questions about the information that made up the projections or their reliability.

## II.    Legal Standard

The parties' dispute centers on the Code's requirement that a nonconsensual Sub. V plan be "fair and equitable."  § 1191(b).  To meet this requirement, the debtor must satisfy the court "that the Plan adequately commits all disposable income to making payments for the life of the plan."  *In re Channel Clarity Holdings, LLC*, No. 21-07972, 2022 WL 3710602, at *15 (Bankr. N.D. Ill. July 19, 2022).  The Code defines disposable income for purposes of the "fair and equitable" test, in relevant part, as "the income that is received by the debtor and that is not reasonably necessary to be expended . . . for the payment of expenditures necessary for the continuation, preservation, or operation of the business of the debtor." § 1191(d).

Few courts have weighed in on the precise issue before the court.  There is little authority, binding or otherwise, because Sub. V is still quite new compared to the rest of the Code.  Created by the Small Business Reorganization Act, Sub. V became effective less than five years ago, in

February 2020.[3]   The court considers persuasive some well-reasoned Sub. V cases from other

bankruptcy courts, as well as case law decided under very similar chapter 12 provisions.

A.   **The Debtor Bears the Burdens of Proof and Persuasion to Show that Its Plan
Meets the Statutory Requirements**

A debtor bears the burden of showing the court that the plan's treatment of disposable

income is "fair and equitable."[4]   Once a debtor meets its burden, "the court *shall* confirm" its plan,

even if a creditor objects.   § 1191(b) (emphasis added).   A debtor must provide projections

demonstrating the debtor's ability to make payments under the proposed plan and explain how the

debtor is calculating its projected disposable income.  § 1190(1)(C).   Such projections are critical

because, once a nonconsensual plan is confirmed, only a debtor may modify it.  § 1193(c).   If the

debtor's actual income is lower than projected, the debtor must nonetheless pay the full amount as

projected in the plan (but it can ask the court to approve a modification).  If it turns out the debtor's

actual income is higher than projected, those gains inure only to the debtor's benefit: a creditor

cannot ask for the debtor's payments to increase.  8 COLLIER ON BANKRUPTCY ¶ 1191.05. Creditors

thus bear the risk that a debtor will underestimate its projected disposable income at confirmation.

The debtor must satisfy the court that the projections are credible, and thus the plan is fair

and equitable, before the court can confirm the plan. It is true that a small business debtor's

projections deserve some deference, since looking into the financial future "is not an exact

science."  *Channel Clarity,* No. 21-07972, 2022 WL 3710602, at *6 (*quoting In re Lost Cajun

Enters., LLC*, 634 B.R. 1063, 1073 (Bankr. D. Colo. 2021)).  But an objection may be warranted,

and the court must consider whether the estimate of projected disposable income is reliable and

---

[3] Small Business Reorganization Act of 2019, Pub. L. No. 116-54, Aug. 23, 2019, 133 Stat. 1079.

[4] At the hearing on October 7, Premier Glass sought to show that it had provided CGI with the bases for its projections.  But at a confirmation hearing, the debtor must satisfy the *court*, not an objecting creditor.  Indeed, in the context of a nonconsensual plan, it would be an exercise in futility to try to satisfy an objecting creditor—for upon satisfaction, the creditor would no longer object.

accurate based on the evidence presented.[5]  Moreover, once an interested party brings an objection, the debtor must show the court why the objection is unfounded; the burden does not shift to the objector to prove that a plan is *not* "fair and equitable."  *In re Trinity Family Prac. & Urgent Care, PLLC,* 661 B.R. 793, 808-809 (Bankr. W.D. Tex. 2024).  When a creditor raises questions as to the reasonableness of expenses the debtor includes on a projected budget, the debtor at minimum must be able to explain to the court's satisfaction how those costs have been calculated.  *See In re Trimax Med. Mgmt., Inc.*, 659 B.R. 398, 403 (Bankr. M.D. Ga. 2024).

These requirements are statutory minimums, but because confirmation is within a judge's discretion and this list is non-exhaustive, "a court may consider other relevant factors as well" when determining whether a plan is fair and equitable under 1191(c).  *Hamilton v. Curiel (In re Curiel)*, 651 B.R. 548, 561 n.7 (9th Cir. B.A.P. 2023).

B.  **Under the "Best Efforts" Test, A Debtor Must Commit All Projected Disposable Income**

So, the debtor must prove its own case for confirmation. What exactly must it prove? In short: the disposable income test requires that the debtor will make its "best efforts" (will commit its entire projected disposable income) to pay its creditors for the full duration of the commitment period.  *In re Pearl Res.*, 622 B.R. 236, 265-66 (S.D. Tex. Bankr. 2020).  The period of commitment may not be less than three years, but it may be as long as five years if the court believes that is necessary for the plan to be considered fair and equitable. § 1191(c)(2)(A).

The projected disposable income test is also called the "best efforts" test, which highlights why the Sub. V approach has been so successful.[6]  *Pearl Res.,* 622 B.R. at 267-68.  One of the

---

[5] Paul W. Bonapfel, *A Guide to the Small Business Reorganization Act of 2019*, p. 149 (rev. June 2022), https://www.flsb.uscourts.gov/sites/flsb/files/documents/Guide_to_the_Small_Business_Act_of_2019_%28Hon._Paul_Bonapfel_rev._06-2022%29.pdf, *archived at* https://perma.cc/UQ3N-KMQV.
[6] The ABI's task force on Subchapter V concluded that the best efforts test is an "effective substitute for the protections of the absolute priority rule . . . and as a practical matter is more beneficial to unsecured creditors." ABI

biggest innovations of Sub. V was that Congress removed the absolute priority rule and replaced it with a projected disposable income test.  Under Sub. V's innovative approach, a debtor "can retain ownership interests . . . at the expense of and over the objection of its creditors," but Congress maintained balance by adding other limitations. *Cantwell-Cleary Co. v. Cleary Packaging, LLC (In re Cleary Packaging, LLC),* 36 F.4th 509, 517 (4th Cir. 2022).  The dissenting unsecured creditors receive value similar to what they would receive in chapter 12 and 13 cases: as much as the debtor can pay.  *Id.*; *see also In re Who Dat?*, *Inc.*, No. 21-10292, 2024 WL 1337453, at *9 (Bankr. E.D. La. Mar. 27, 2024) (quoting *In re EAS Graceland LLC*, No. 20-24484, 2021 WL 10395821 at *9 n.7 (Bankr. W.D. Tenn. July 20, 2021)).  By statute, creditors also must receive more than they would in a hypothetical chapter 7 liquidation, because  confirmation under § 1191(b) requires compliance with § 1129(a)(7) and all other § 1129(a) paragraphs except (8), (10), and (15).

The "best efforts" approach to disposable income has its roots in Chapter 12, through which family farmers with regular income can reorganize their debts in a manner similar to chapter 13 debtors.  Before the enactment of chapter 12, family farmers struggled to get plans confirmed for the same reasons as many small businesses prior to Sub. V: the absolute priority rule.  8 COLLIER ON BANKRUPTCY ¶ 1200.01 (16th ed. 2024).  As multiple courts and commentators have noted, chapter 12 and the Sub. V business provisions on disposable income have the exact same wording. § 1991(d); § 1225(b)(2); *see, e.g., In re Hyde*, No. 20-11525, 2022 Bankr. LEXIS 1571, at *26 (Bankr. E.D. La. June 6, 2022) (*citing Pearl Res.*, 622 B.R. at 265)).  Congress appears to have intended the same compromise for both Sub. V and chapter 12 debtors, and chapter 12 precedents

---

Subchapter V Task Force, *Final Report of the ABI Institute Subchapter V Task Force*, p. 13 (2024) https://abi-org.s3.amazonaws.com/SubV/SBRA_Final_Report.pdf, *archived at* **https://perma.cc/C4T7-VA5C**.  When a small business debtor's plan is confirmed and succeeds, both the debtor and the unsecured creditors tend to receive more on balance than they would have in a regular Sub V case. *Id.*

therefore provide persuasive authority on the disposable income (and the fair and equitable) requirements of Sub. V.

Under Seventh Circuit precedents, the best efforts test allows chapter 12 farmer-debtors to retain sufficient but not extravagant levels of income. On the one hand, "disposable income represents 'left overs,'" the amount remaining after what it costs to run a business. *Matter of Fortney,* 36 F.3d 701, 705 (7th Cir. 1994). There may be a case where a farmer has no disposable income (due to payments to secured creditors). That hypothetical case may be confirmable, notwithstanding there are no "leftovers" for unsecured creditors. On the other hand, "[a] debtor whose income greatly exceeds expenses may provide unsecured creditors with a substantial amount of disposable income." *Id.* The disposable income provision exists "to prevent large expenditures by debtors for non-essential items which ultimately reduce the sum available to pay holders of unsecured claims." *Id.* at 704 (*quoting In re Hedges*, 68 B.R. 18, 20-21 (Bankr. E.D. Va. 1986)). Analyzing the best efforts test in the context of good faith—because there was no comparable "fair and equitable" provision in chapter 12—the Court concluded that the question "reduces to whether the [debtor's] plan represents a sincere effort at repayment of their obligations, or is instead an effort to thwart repayment." *Fortney,* 36 F.3d at 707 (*quoting In re Schaitz*, 913 F.2d 452, 453-54 (7th Cir. 1990) (cleaned up)).

Extrapolating to the issue in this case, the court concludes that a debtor seeking to confirm a nonconsensual plan under Sub. V. bears the burden of showing that its plan is fair and equitable. To do that, it must show a "sincere effort" regarding two things: first, it must show that there is a reasoned basis for its projections, and second, it must show that line items deducted from disposable income are indeed "necessary for the continuation, preservation, and operation of the debtor's business" and therefore fair and equitable to the unsecured creditors. § 1191(c) and (d).

7

### III.   Analysis

#### A.  Jurisdiction

The confirmation of a plan is a core proceeding under 11 U.S.C. § 157(b)(1) and (2)(L). The court has subject matter jurisdiction pursuant to 11 U.S.C. § 1334 and the District's internal operating procedure, which refers such matters to bankruptcy courts.  Internal Operating Procedure § 15(a).  Venue is proper under 28 U.S.C. § 1409(a).

#### B.  The Projections and the Plan are Effectively for Four Years, Not Five

CGI did not vote in favor of the plan, so Premier Glass must confirm it as a nonconsensual plan, which requires, among other things, that the debtor commit its projected disposable income toward payments to unsecured creditors.  The minimum length of commitment for a nonconsensual plan is three years, but "the court may fix" a longer commitment period under § 1191(c)(2)(A) and (B).  The date of the first payment under the plan is the beginning of the commitment period.  8 COLLIER ON BANKRUPTCY ¶ 1191.04.  Projections should show anticipated earnings and expenses, calculate projected disposable income, and illustrate the debtor's ability to make payments under the plan.  For that reason, the projections should reflect the commitment period.

Premier Glass provided projections for the years 2024-2028, but it proposed to make its first payment in 2025.  The plan states: "The payments to Holders of Allowed Class 2 Claims . . . shall commence on January 1, 2025 and continue quarterly through January 1, 2029."  (Tr. Ex. 7, also at First Am. Plan, ECF No. 88, at ¶ 10.04.)  In effect, the debtor has provided projections and a payment scheduled for a four-year plan (or just over), not a five-year plan.

8

C. **The Debtor's Projections and Testimony Did Not Establish that the Tax and Depreciation Projections had a Reasoned Basis**

CGI objected to Premier Glass's line-item deductions for depreciation expenses, taxes, and legal fees. Based on testimony from the Sub. V Trustee, the line items for taxes and depreciation expenses may indeed be necessary for the continuation, preservation, and operation of the debtor's business. (The court addresses the legal fees in the next section.) But to meet its burden of proof, Premier Glass also needed to show, at a minimum, that there was a reasoned calculation behind the projected numbers. Without showing the latter, the court can't determine the former. Although this burden is not high, Premier Glass failed to carry it.

Premier Glass did not meet its burden of explaining how it had calculated the line item for taxes deducted from disposable income. The court found credible the testimony that it may indeed be necessary for a debtor to calculate its income on an after-tax basis, since it is a pass-through entity for income tax purposes.[7] But the Sub. V Trustee could not explain the basis for the calculations on the projections—in large part because the Sub. V Trustee made these tax projections based only on information provided by Premier Glass.

The Sub. V Trustee testified that the projections were based on historical data, on "what's fair to project going forward," and on information received from other professionals (i.e., the debtor's CPA).[8] Mr. Brash referred to the debtor's Operating Agreement, which was admitted as an exhibit. (Tr. Ex. 14.) It was not clear, however, from his testimony whether Premier Glass was required to make tax reimbursements to its members only when it had sufficient disposable income, if such reimbursements were always necessary, and how this determination was made in

---

[7] *See* Bonapfel, *supra* note 5*, at 147 ("When the generation of income by a business gives rise to taxation, it seems appropriate to determine disposable income on an after-tax basis.").

[8] The court takes judicial notice of the fact that the Debtor's first plan of reorganization, proposed March 18, 2024, did not provide a deduction for taxes in its projections. ECF No. 26, Ex. E.

the past.  He testified that the tax numbers were obtained from the CPA, but testimony about any conversation with the CPA was excluded after a hearsay objection was sustained.  Premier Glass might have called for testimony from another party with personal knowledge of its business or accounting practices, but it chose not to.

As a result of this deficiency, Premier Glass could not explain to the court where the numbers on the spreadsheet came from, how they related to the business's income, or on what basis the debtor had historically made tax reimbursements to principals.  For instance, the Sub V. Trustee was unable to explain why taxes were projected to be roughly the same in 2024 as they had been in 2023, even though the company operated at a loss in 2023.  Without testimony or evidence to show that there was a relationship between the projected numbers and what Premier Glass expected to have in income, the court could infer only that the numbers were placeholders intended to create a reserve for reimbursements to equity holders.  Faced with seemingly arbitrary numbers, the court had no way of knowing whether the projection had any reasoned basis, whether the deduction was necessary, and whether Premier Glass really was committing all of its projected disposable income.

Similarly, Premier Glass did not meet its burden as to depreciation expenses.  Taking Premier Glass at its word, based on the testimony of the Sub. V Trustee, the court understands that the line item called "depreciation expenses" is really meant to be a "placeholder" for "replacement costs" and "capital expenses."  The line item for depreciation expenses thus appears to be in the nature of cash reserves set aside for anticipated expenses, rather than a reflection of mere "paper losses."[9]  Judge Paul W. Bonapfel notes that, as in this case, "[q]uestions may arise when the debtor

---

[9] It is clear from the Sub. V Trustee's testimony that the line item was not meant to reflect "depreciation" strictly and thus did not stand in for mere "paper losses."  *In re Linden*, 174 B.R. 769, 772 (Bankr. C.D. Ill. 1994).  The court acknowledges that the line item was inaptly named but declines to hold the Debtor to a specialist's definition.

wants to establish a reserve [because] creditors may reasonably argue that the disposable income they must receive should not be depleted when the debtor will gain the benefit of the investment of income in the business."[10]

In cases where courts have allowed debtors to deduct reserves for replacement costs or capital expenditures from their projected disposable income, they did so because they received evidence that such reserves were necessary to the business as a going concern, which meant that creditors received more even though the reserve primarily benefited the debtor.[11] In the Sub. V business context, one court found acceptable a debtor's proposed operational reserve of $20,000 because the debtor was an urgent care medical center whose cash flows were affected by factors outside its control, such as the amount of time it took insurance to pay claims. *In re Urgent Care Physicians*, No. 21-24000-beh, 2021 Bankr. LEXIS 3466, at *27-28 (Bankr. E.D. Wisc. Dec. 20, 2021). Though the operating reserve was a kind of slush fund, the court found that the debtor had compellingly explained its necessity.

The court found credible the Sub. V Trustee's testimony that a business like Premier Glass, which provides specialized installation services, cannot serve its customers if it does not replace broken or outdated equipment, meaning expenditures for replacement equipment may plausibly be necessary under § 1191(d). The court is also willing to analogize the Debtor's proposed reserve for replacement costs to the operating reserve in *Urgent Care*. But without knowing what, if any, equipment will need to be replaced, or what other capital expenditures might be funded with the reserve, there is no way for the court to know if the reserve is necessary to the continuation, preservation, and operation of the business. Someone familiar with Premier Glass's business— say, the company's president, who was on Premier Glass's witness list and present for the

---

[10] Bonapfel, *supra* note 5, at 146.
[11] *Id.*, at 146 n.392 (collecting cases).

11

proceedings—might have provided this information.  But Premier Glass relied only on the testimony of the Sub. V Trustee and provided no evidence at all to explain how historical costs had arisen or if it already anticipated certain equipment needing to be replaced.

It is unlikely that, in the absence of an objection, a bankruptcy court would raise *sua sponte* the issue of whether the values provided in a debtor's projections had a basis in fact.  *See In re Trinity Family Prac. & Urgent Care PLLC*, 661 B.R. 793 (Bankr. W.D. Tex 2024) (acknowledging that it is uncommon for a court to raise *sua sponte* the issue of the debtor's period of commitment) (*citing In re Orange Cnty. Bail Bonds, Inc.,* 638 B.R. 137, 146 (B.A.P. 9th Cir. 2022)).  But there *was* such an objection in this case, and the bankruptcy court has an obligation to ensure that the debtor's plan meets the requirements of the Code.  Because Premier Glass did not meet its burden of showing that its projections for taxes and depreciation were credible, the court had no basis to conclude that the plan was fair and equitable, and it cannot be confirmed.

D.  **Premier Glass Has Not Shown That Its Projected Litigation Expenses Are "Reasonably Necessary"**

Premier Glass also failed to carry its burden regarding what appears to be a novel legal issue, the legal fees. The debtor did not show that the line item for legal fees was based on a reasoned projection, and it did not show that paying the legal fees was necessary for the continuation, preservation, or operation of the business of the debtor. In a more general sense, the court was unconvinced that, based on the evidence before it, the line item for legal fees was fair and equitable.

The legal fees are primarily related to litigation over the arbitrator's award for tortious interference, which resulted in Premier Glass owing over $2 million to CGI.  It is understandable why Premier Glass wants to continue to challenge the award; without that debt, the company would not be in bankruptcy at all.  When Premier Glass initially filed bankruptcy in Delaware, it

apparently thought its litigation with CGI was over: it only scheduled legal fees of $25,000 per year in its first projections, dated March 18, 2024.  (Ch. 11 Plan, ECF No. 26, Ex. E.)  Now, however, Premier Glass anticipates it will spend more than $100,000 per year on litigation.  The court infers that Premier Glass changed its mind when CGI initiated an adversary proceeding three weeks after those projections, asking the court to determine its claim was not dischargeable.

From Premier Glass's perspective, the litigation war chest is necessary to fund its appeals, because if it wins its appeal, then CGI will no longer have a claim against Premier Glass.  This concern is especially pressing because CGI's claim may be found to be nondischargeable. (Memorandum Opinion, Adv. Case No. 24-00096, ECF No. 17.)  From CGI's perspective, these fees reduce the disposable income they are entitled to, in the service of challenging its claim.  Class 2 (CGI and the counsel who represented Premier Glass pre-petition) are the only non-insider, unsecured creditors who will not be paid in full.  If CGI ultimately prevails, the deduction for legal fees will be a total loss, and will be, in effect, a transfer from Class 2 to the Premier Glass's counsel. It appears, therefore, that the legal fees provide considerable benefit to the business's equity holders at the expense of the unsecured creditors:  Because de la Cruz is a joint tortfeasor with Premier Glass, he gains a benefit from Premier Glass's continuing litigation of the arbitration award.  (Based on testimony at the confirmation hearing, the court understands that Premier Glass and de la Cruz have separate counsel.  It is undeniable, however, that de la Cruz will reap what Premier Glass sows.)

The court finds persuasive the analyses conducted by other courts in comparable cases, as well as Judge Shad M. Robinson's analysis in *In re Trinity Family Practice & Urgent Care, PLLC*, 661 B.R. 793 (Bankr. W.D. Tex. 2024).  In that case, a creditor who had voted against the plan objected that a debtor's three-year period of plan payments was not fair and equitable under §§

13

1191(b) and (c).  The creditor argued that the plan provided for only minimal plan payments to unsecured creditors, and the Court should fix a longer period for repayment.  Acknowledging the relative novelty of the issue, the court proposed a non-exclusive list of factors to consider as "instructive in [a court's] analysis of the totality of the circumstances":

i.  Capital reserves or capital expenditures during the period of plan payments;
ii.  Reasonableness of income and expenses set forth in the plan projections during the period of plan payments as compared to historical operations and operations during the post-petition, pre-confirmation time period;
iii.  Salary and/or other payments to insiders during the period of plan payments;
iv.  Risks and consequences of a longer period of plan payments; and
v.  Any other unique or extraordinary facts specific to the case.

*Id.* at 822-23.  Judge Robinson explained, "The burden is on the Debtor to prove that each of these factors support the period of plan payments set forth in the proposed Plan [and] no factor alone is dispositive or controlling."  *Id.*  Ultimately, these factors help a court weigh whether plan provisions unreasonably benefit a debtor at the expense of the unsecured creditor class—and most of these weigh against finding this plan to be fair and equitable.

The plan essentially creates three capital reserve line items for Premier Glass, line items that, in combination, add up to more than the debtor's projected net income:

| | 2023 Actual[12] | 2024 Projected | 2025 Projected | 2026 Projected | 2027 Projected | 2028 Projected | Total 5-Year Projected Amount |
|---|---|---|---|---|---|---|---|
| Legal Fees | 462,577 | 277,546 | 111,355 | 113,582 | 115,854 | 118,171 | 736,509 |
| Depreciation Expenses | 37,686 | 38,440 | 39,209 | 39,993 | 40,793 | 41,609 | 200,043 |
| Taxes | 43,810 | 43,812 | 104,824 | 106,920 | 109,059 | 111,240 | 475,855 |
| Net Income | (54,908) | 148,814 | 264,299 | 269,585 | 274,976 | 280,476 | 1,238,150 |

As discussed, based on testimony these line items appear to have little basis in fact or reasoned projection.  But no provision in the plan increased payments to CGI in the event that they proved

---

[12] The numbers in this chart come from Tr. Ex. 8, also available on the docket as Am. Ex. E (Sub-V 5-Year Projections), ECF No. 99.

14

inaccurate: if tax reimbursements or replacement costs were lower than guessed, or if the parties settled their litigation early. In other words, there is no "true-up" provision. While courts disagree about whether a bankruptcy judge can *require* a true-up, there is no binding precedent to prevent a court from confirming a plan where a debtor has included such a provision.[13] A true-up may be especially appropriate where, as here, a debtor sets aside large reserves for projected capital expenditures that benefit its insiders at the expense of its creditors.

A true-up seems especially appropriate for the legal fees deduction, because it does not appear there is any real relationship between past legal expenses and projections. The Sub. V Trustee stated the numbers were based on historical information, his conversations with the firm handling the post-petition litigation, and his impression of the intent of the parties. But in testimony, it became clear to the court that numbers on the projections were reflections of the Sub. V Trustee's belief that Premier Glass would litigate "forever," to "the end of time," to the "ends of the earth." He stated that he believed:

> [I]t's reasonable to try to settle the case, and it would have been in the best interest for everybody to have done it already. I can't make a comment based on what the parties want. It's an unstoppable force crashing into an immovable object . . . In my opinion, there should be no legal fees moving forward.

There was no evidence as to how the estimated numbers were valued, why a negative 40% growth rate was appropriate for the legal fees, or why the numbers should be largely consistent year-to-year in light of an unpredictable appeals process.

---

[13] Courts are split as to whether a court can require payments based on actual results. Paul W. Bonapfel, *Subchapter V Update*, pp. 11-13 (March 2024) https://www.ganb.uscourts.gov/sites/default/files/sub_v_update_march_2024_331-24.pdf, *archived at* https://perma.cc/73AH-JVZ4– (*citing Legal Service Bureau, Inc., v. Orange County Bail Bonds, Inc. (In re Orange County Bail Bonds, Inc.)*, 638 B.R. 137 (B.A.P. 9th Cir. 2022); *In Staples v. Wood-Staples ( In re Staples)*, No. 2:22-cv-157-JES, 2023 U.S. Dist. LEXIS 2684 (M.D. Fla. Jan. 6, 2023)). *See also In re Packet Construction, LLC,* No. 23-10860, 2024 Bankr. LEXIS 1053 (Bankr. W.D. Tex. Apr. 30, 2024) (collecting cases and concluding that both statutory language and policy militate against requiring true-ups as a general rule, but conceding that there may be a circumstance in which a true-up provision would be necessary to confirm a fair and equitable nonconsensual plan).

The lack of a true-up provision also seems problematic because Premier Glass may run out of road for litigation before the commitment period ends.  Although he acknowledged the rancor between the parties, the Sub. V Trustee stated, with no more support than his other statements, that "[w]e hope that there will be settlement so they [the fees] can be cut significantly."  Yet, if the litigation does finalize before the commitment period ends, the final amount that Premier Glass pays will not change; it is based on the projections at confirmation.[14]  Ultimately, Premier Glass has everything to gain from this litigation, which it is asking CGI to fund.  CGI, on the other hand, can only lose, both coming and going.  The Trustee's testimony did not help assuage these concerns, since his comments were inconsistent, if not paradoxical, and did not show that the capital reserve for legal fees was fair and equitable to CGI.

With regard to the third factor, the salary de la Cruz shall receive as a guaranteed payment, the Debtor did not provide any evidence of "belt tightening" that could weigh in its favor.  *Trinity Family,* 661 B.R. at 825 (*citing In re Buntin*, 161 B.R. 466, 468 (Bankr. W.D. Mo. 1993)).  In *Urgent Care,* a case in which a principal's salary weighed in favor of fairness and equity, the court approved of the debtor's deduction for an operating reserve because the debtor's principal and his family took steps to reduce expenses, including accepting salaries below market rate. The debtor also deferred scheduling the wages of the principal and others as administrative expenses, thus deferring some payments in order to make up for the deduction.  *In re Urgent Care Physicians*, No. 21-24000-beh, 2021 Bankr. LEXIS 3466, at *27-28 (Bankr. E.D. Wisc. Dec. 21, 2021).  Under the totality of the circumstances—even though the operating account reduced payments to unsecured creditors and was largely within the debtor's discretion—the belt tightening proved the debtor was sincerely trying to pay its creditors.

---

[14] If the claim is found to be nondischargeable, then Premier Glass will, of course, end up having to pay more than the amount projected in the plan.

16

In this case, by contrast, the debtor's principal is receiving a salary on par with historicals and, as a joint tortfeasor, he is also reaping the benefits of the litigation war chest. Evidence of belt tightening might have helped persuade the court that the plan is fair and equitable in its treatment of insiders. The Sub. V Trustee testified that the salary figure for de la Cruz (the "guaranteed payment") was calculated based on the historical salary de la Cruz had received, plus a modest year-over-year increase. He opined that the amount (approximately $170,000 per year) was not "exorbitant" or "necessarily outrageous." But the debtor presented no evidence as to the market or industry rate. Instead, the Sub. V Trustee testified that the company "has to have" de la Cruz. If the company will fail without de la Cruz, then the salary may indeed be necessary. But there was no evidence that the projected value had been reached through any kind of analysis, let alone analysis of fairness to unsecured creditors. And if the litigation war chest is likened to an expenditure on behalf of an insider (a benefit to the principal on top of his salary), then this factor weighs firmly against the debtor.

The court must consider as a final factor that this case is in essence a two-party dispute, and the history between the parties suggests that Premier Glass has every incentive to continue to challenge the underlying claim—though it has not (yet) objected to it in the manner provided by the Bankruptcy Code. A plan whose primary focus is to evade paying a creditor rather than commit the debtor's total projected disposable income is not fair and equitable. *See Who Dat?*, No. 21-10292, 2024 WL 1337453, at *10 ("This Plan served only as a vehicle for the personal interests of WDI's principals and an attempt by those principals to manipulate the bankruptcy process to the detriment of the estate's sole non-insider prepetition creditor."). The plan gives Premier Glass sole discretion over how to spend the litigation fund, and the Code, as Congress has written it, gives Premier Glass sole discretion over whether to modify the plan. In the absence of the legal fees,

the projected disposable income that would go to Class 2 in 2025 would surge from $264,299 to $375,654, increasing almost by half.  (Tr. Ex. 8, also at Am. Ex. E, ECF No. 99.)  This is not an insignificant line item.  The court cannot ignore these unique circumstances.  Given the rancor between the parties, the lack of evidence showing how the projections were calculated, and the fact that nearly every dollar spent on the litigation is a dollar that could otherwise go to CGI, this factor weighs against finding the plan fair and equitable.

## IV.  Conclusion

The debtor has not met its burden of showing that the plan is fair and equitable pursuant to 11 U.S.C. § 1191(c) and (d), and confirmation is denied without prejudice.

Dated: November 8, 2024

_____
Honorable Deborah L. Thorne
United States Bankruptcy Judge